BRISTOL TECHNOLOGY,
INC., Plaintiff,

v.

MICROSOFT CORPORATION,
Defendant.

No. Civ.A. 3–98–CV–1657.

United States District Court,
D. Connecticut.

Dec: 30, 1998.

Patrick Lynch, O'Melveny & Myers, Los Angeles, CA, Annette Poblete, Achilles M. Perry, O'Melveny & Myers, New York City, John L. Altieri, Jr., Bristol Technology, Inc., Danbury, CT, for Bristol Tech., Inc., plaintiff.

David B. Tulchin, Michael T. Tomaino, Jr., Marc De Leeuw, Elizabeth P. Martin, Sullivan & Cromwell, New York City, Stefan Richard Underhill, Day, Berry & Howard, Stamford, CT, Steven J. Aeschbacher, Microsoft Corporation, Redmond, WA, for Microsoft Corp., defendant.

## MEMORANDUM OF DECISION ON MOTION FOR PRELIMINARY INJUNCTION

HALL, District Judge.

The plaintiff, Bristol Technology, Inc. ("Bristol"), commenced this action on August 18, 1998. Its fourteen claim Complaint alleges federal and state antitrust claims and other state statutory and common law claims. Bristol also filed a Motion for Expedited Discovery and a Motion for a Preliminary Injunction. The court granted the former Motion and, after several scheduling conferences and issuance of a preliminary discovery schedule, held a hearing on the latter motion.[1] For the reasons set forth below, the court DENIES the Motion for Preliminary Injunction [Dkt. #3] and sets the case down for trial commencing June 1, 1999.

## I. BACKGROUND

The defendant, Microsoft Corporation ("Microsoft"), is the owner and distributor of computer operating systems, including Windows, Windows 95, Windows 98, Windows for Workgroups, and Windows NT. A computer operating system controls the basic functions of the computer hardware. It also facilitates interaction between the hardware and application programs. Application programs, such as word processing and spread sheet programs, give the computer its functionality by providing the computer with instructions for the performance of a task. To run, an application program must be able to present commands and respond to the operating system in precisely the format and according to the precise protocols used by that operating system. Therefore, independent software vendors ("ISVs") must write application programs that are compatible with the operating system's application programming interfaces ("APIs"). Because different operating systems have different protocols and APIs, application programs written for one operating system usually must be translated or rewritten to work on another operating system.[2]

Microsoft has developed operating systems for personal computers, technical workstations and departmental servers. A technical workstation is a microprocessor-based machine typically used for highly computational, technical applications. A departmental server is a microprocessor-based machine that is used to provide or manage common services and functions for other computers that are linked together in a small to medium-sized network.

Beginning in the 1980s with the development of MS/DOS,[3] Microsoft has produced

---

1. Evidence was taken on October 14, 15, 19 and 20, 1998 and post-hearing argument was held on October 28, 1998.

2. Programs written in the JAVA language, developed and licensed by Sun Microsystems, are exceptions. JAVA is designed to allow ISVs to write application programs that can be used on more than one operating system.

3. MS/DOS was the original operating system offered for IBM personal computers.

operating systems that now comprise more than 90% of the personal computer operating system market. In 1993, Microsoft entered the departmental server and technical workstation operating systems markets with the introduction of Windows NT. In each of those markets, Microsoft's share has grown from a fraction of 1 percent in 1993 to 44% and 28%, respectively, by the end of 1997.

Bristol was formed in 1991 by several members of the Blackwell family. Its business plan was to develop a cross-platform product which, when installed on a UNIX-based operating system,[4] would run application programs written for the Windows operating system.[5] Bristol eventually developed such a program, called "Wind/U," by reverse engineering the Windows operating systems to obtain the necessary source code.[6]

After it began marketing Wind/U, Bristol was contacted by Microsoft, which offered to help improve the product by providing Bristol with access to source code for the current and soon-to-be-released product versions of Windows operating systems. Microsoft and Bristol eventually entered into a contract dated September 21, 1994. This contract was part of what Microsoft called the "WISE Program,"[7] a licensing program from Microsoft designed to enable ISVs to translate or run Windows applications on UNIX and Macintosh systems.

Microsoft created the WISE Program at a time when makers of UNIX-based operating systems had sizeable shares of the server and workstation markets and Microsoft had nearly none.[8] Microsoft contracted with Bristol and others through the WISE Program in order to encourage ISVs to write cross-platform applications on Windows NT 3. The message that Microsoft conveyed publicly was that, through the WISE Program, applications written for Windows could be easily made available to UNIX users by translating, or porting, those applications using a WISE product, such as Bristol's Wind/U. This meant that a developer who chose to write Windows applications would be able to take advantage of the emerging Windows market while maintaining its position as an application developer for UNIX systems.

Under the terms of the 1994 WISE contract with Bristol, Microsoft agreed to, and did, provide all source code for all version releases and update releases of Microsoft Windows 3.1, Windows for Workgroups 3.1, Windows NT 3.5 and its yet to-be-released "Chicago" software product (later known as Windows 95).[9] The WISE con-

---

4. "UNIX" is a core of technology originally developed at AT & T Bell Laboratories. There are various versions of the UNIX system, as well as other, non-Windows operating systems such as Open VMS and IBM's OS/390, to which Bristol's product can translate Windows applications. For convenience, the court will use "UNIX" or "UNIX-based" to refer to all of these operating systems.

5. Wind/U was offered in two ways. Bristol developed a software development kit for Windows software application developers. This product allows a particular Windows program to run on UNIX. Bristol also offers a Wind/U product, which, when installed on a UNIX-based operating system, enables that system to run any Windows application.

6. "Source code" is the computer program as written by the programmer. It includes both logic, expressed in algebraic-like equations or human readable words, and "comments" which are human language text written to provide understandable descriptions of the intent of the program's logic. Because operating systems have different APIs, source code is needed to create an effective cross-platform product.

7. WISE is an acronym for *W*indows *I*nterface *S*ource *E*nvironment.

8. In 1993, shipments of new UNIX operating systems represented 23.6% of shipments in the server market and 94% in the workstation market. Comparable Microsoft figures were 0.7% and 0.1%.

9. "Version release" and "update release" were defined in the contract as a change in the product designation number to the right of the decimal period, in the tenths and hundredths digits respectively. For example, a version release of Windows 3.1 would be des-

tract did not give Bristol access to the source code for product releases of the named operating systems.[10]

Well in advance of the expiration of the 1994 contract, Bristol undertook efforts to negotiate a new contract that would cover new product releases such as NT 4 and NT 5, the latest product versions of Microsoft's operating system for servers and workstations.[11] This effort continued for approximately two years, up to the filing of this lawsuit. During the negotiations, Microsoft informed Bristol that it would not, in any renewed agreement, give all the source code for new product releases to Bristol as it had under the 1994 WISE contract. Rather, Microsoft insisted that it would agree to provide only a selected portion, or "apple core," of the source code. Further, Microsoft's final proposal called for a 400% increase in royalties on Wind/U sales to original equipment manufacturers ("OEMs") for packaging as part of a UNIX operating system.[12]

Bristol asserts that Microsoft, with its dramatic market share growth and the significant increase in the number of applications for Windows NT, no longer believes it is necessary to provide a "bridge" back to UNIX for ISVs. Because the cross-platform tools developed by Bristol and the other WISE partners rely on Windows source code, Microsoft is able to control what functions can be ported between the systems by limiting access to the relevant source code for new product releases of Windows operating systems.

Bristol claims that it is now in Microsoft's interest, and that it is Microsoft's plan, to restrict portability by strategically weakening the functionality of cross-platform products, such as the one offered by Bristol. In essence, Bristol claims that Microsoft has engaged in anticompetitive conduct (1) by offering only an "apple core" of source code; (2) by proposing prohibitively high royalty fees;[13] and (3) in its discretionary use of royalty waivers. Bristol argues that Microsoft's proposed terms are motivated by its desire to destroy competition from UNIX-based systems, and thereby to achieve a monopoly, in the markets for both technical workstation and server operating systems.

Bristol seeks entry of an Order that would preliminarily enjoin Microsoft from denying Bristol access to all source code for Microsoft's operating systems, including any new product releases.[14] In particular, Bristol seeks access to the source code for Windows NT 5, which is to be released in late 1999.[15] Bristol claims that, unless it obtains the source code for that product release immediately, it will be irreparably harmed.

## II. *DISCUSSION*

### A. Preliminary Injunction Standard.

The fundamental purpose in granting preliminary injunctive relief has always been to preserve the court's ability to later render a meaningful final decision on the

---

ignated as Windows 3.2, whereas an update release would be designated as Windows 3.11.

10. A product release is indicated by a change in the product designation number in the units digit to the left of the decimal. For example, if the current product release were designated as Windows 3.1, then a new product release would be designated as Windows 4.0.

11. For ease of discussion, reference will generally be made to NT 5 because it has been the primary focus of the hearing. The court recognizes, however, that plaintiff also seeks access to existing NT 4 source code.

12. When so packaged, the Bristol product can run all Windows applications loaded onto the UNIX system.

13. Microsoft offered, *e.g.*, a royalty rate of $100 per system, up from the $25 per system provided in the 1994 contract.

14. The Order proposed by Bristol is attached to its Motion [Dkt. # 3].

15. There is conflicting evidence in the record regarding the release date. It is the conclusion of this court that, at this time, the release date is likely to be toward the end of 1999.

merits by preventing irreparable harm in the interim. *See United States v. Adler's Creamery,* 107 F.2d 987, 990 (2d Cir.1939); 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure,* § 2947, at 121 (2d Ed.1995). The issuance of a preliminary injunction rests in the sound discretion of the trial court. *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 931–32, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975); *American Express Fin. Advisors, Inc. v. Thorley,* 147 F.3d 229, 232 (2d Cir.1998).

In the often-cited language of *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* the Second Circuit set forth the standard that normally must be met to warrant issuance of a preliminary injunction:

> The standard in the Second Circuit for injunctive relief clearly calls for a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

596 F.2d 70, 72 (2d Cir.1979). Under the first prong of this standard, the movant "need not show that success is an absolute certainty.... There may remain considerable room for doubt." *Abdul Wali v. Coughlin,* 754 F.2d 1015, 1025 (2d Cir. 1985).

■ However, when the preliminary injunctive relief granted is deemed mandatory, rather than prohibitory, the Second Circuit has prescribed a higher standard.[16] *Tom Doherty Assoc., Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 33–34 (2d Cir.

1995). In both *Abdul Wali* and *Tom Doherty,* the Second Circuit has provided that "a mandatory injunction should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief."[17] *Tom Doherty,* 60 F.3d at 34 (quoting *Abdul Wali,* 754 F.2d at 1025). Accordingly, in addition to establishing a likelihood of irreparable harm, a party seeking a mandatory injunction must make a clear or substantial showing of likelihood of success on the merits.[18] *Tom Doherty,* 60 F.3d at 34.

■ Microsoft argues that an injunction compelling it to turn over intellectual property that Bristol has no contractual right to receive would be a mandatory injunction. In response, Bristol argues that the preliminary relief it seeks would merely maintain the "status quo," continuing the WISE agreement by providing Bristol with the needed source code. However, the new NT product versions, numbered 4 and 5, contain new and different intellectual property than product version NT 3 that was provided under the 1994 WISE contract. Bristol has conceded that no reading of the 1994 WISE contract would obligate Microsoft to deliver the NT 4 or NT 5 source code to Bristol. Moreover, Bristol acknowledges that the "status quo" it refers to is one of expectation, not reality. Bristol's Reply Mem. at 42 ("Microsoft itself expected to extend WISE to NT 4.0 and 5.0"). The court is, therefore, persuaded that the preliminary relief sought is not "status quo" relief, but rather in the

---

16. The heightened standard is also applicable if the injunction will provide the moving party with substantially all the relief he seeks and the relief cannot be undone if the movant fails to prevail on the merits. *Tom Doherty,* 60 F.3d at 33–34. Because of this court's conclusion that the relief sought is mandatory, it will not address the issue of whether the heightened standard is also called for under the second criteria.

17. Although the disjunctive "or" is used, the standard is met only when both requirements

are satisfied. *See Abdul Wali,* 754 F.2d at 1026 ("Accordingly we hold that the prisoners must show a substantial likelihood of success on the merits, i.e., that their cause is considerably more likely to succeed than fail (*together, of course,* with the requisite irreparable injury).") (emphasis added).

18. Although both "clear" and "substantial" have been used to describe the level of proof, they have the same meaning in this context. *Tom Doherty,* 60 F.3d at 34.

nature of a mandatory injunction. Thus, the heightened standard applies.

### B. Irreparable Harm.

■ The court turns first to the issue of irreparable harm. Bristol must establish that there is a likelihood of irreparable harm "before the other requirements for the issuance of an injunction will be considered." *Reuters, Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir.1990). To satisfy this prong, Bristol must demonstrate that the injury "is neither remote nor speculative, but actual and imminent and that [it] cannot be remedied by an award of monetary damages." *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir.1995) (internal quotation marks omitted). "[T]he harm must be so imminent as to be irreparable if a court waits until the end of trial to resolve the harm.". *Rodriguez v. DeBuono*, 162 F.3d 56, 61 (2d Cir.1998) (per curiam).

■ Microsoft argues that there can be no irreparable harm because Bristol has large cash reserves ($4 million). Thus, Microsoft claims, there is no threat of Bristol's going out of business. This argument misses the essence of the harm here. That Bristol may have cash available, and may be willing to infuse that cash into a company with little or no product to sell, does not mean that Bristol would not be "out of business" as that phrase is used in the irreparable harm context. This court does not read "out of business" to be equivalent to Chapter 7 bankruptcy, but rather to refer to substantial loss of business accompanied by loss of good will.[19] *Compare Jack Kahn Music Co. v. Baldwin Piano & Organ Co.*, 604 F.2d 755, 763 (finding no irreparable harm) *with Jacobson & Co., Inc. v. Armstrong Cork Co.*, 548 F.2d 438, 445 (2d Cir.1977) *and Interphoto Corp. v. Minolta Corp.*, 417 F.2d 621, 622 (2d Cir.1969) (concluding that loss of goodwill is incalculable). Under this standard, Bristol has demonstrated irreparable harm.

■ Wind/U has been Bristol's principal product and revenue generator since its creation.[20] Although Bristol provides consulting services and sells a few other products, this case is not like others in which the plaintiff had many other lines or products to sell. *See, e.g., Jack Kahn Music*, 604 F.2d at 759 (noting that plaintiff sold numerous makes and models of pianos and organs in addition to defendant's terminated line). Wind/U is almost the entirety of Bristol's business.

The bulk of Bristol's business will disappear without access to the new Microsoft source code before trial. Bristol's ISV customers seek to release Windows and UNIX versions of their application programs when Microsoft releases NT 5. Therefore, Bristol must release its updated Wind/U product at about the time of Microsoft's NT 5 release. Microsoft is likely to ship NT 5 toward the end of 1999. Bristol requires six to eight months from the time that it receives Microsoft's source code to develop its product for use by ISVs.[21] Thus, even if this case could be

---

**19.** The court does not mean to suggest that a loss of merely some business would meet the irreparable harm standard. A loss of substantially all its business is required. *See Jack Kahn Music Co. .*, 604 F.2d at 762–63. The court finds such a situation to exist in this case.

**20.** Bristol will continue to earn revenue from Wind/U royalties for some period, but it is insufficient to sustain its business. The likely precipitous drop in revenues from Wind/U is reflected in the decline in the number of potential customers engaging in an "evaluation" or a trial run of the product. For example,

nineteen potential customers evaluated Wind/U in August 1997; only three potential customers did so in August 1998. Because over 95% of Bristol's new sales come from customers who have first evaluated the software, the number of evaluations serves as a leading indicator of Bristol's sales.

**21.** Microsoft has already released preliminary versions of NT 5 source code to ISVs so that the ISVs can begin to develop NT 5 application programs. It is Microsoft's expectation that over 60,000 such applications for NT 5 will be on the market when it is released. Within 18 months of release, it is further

tried in June of 1999 and judgment was entered in Bristol's favor, it would be too late for Bristol to develop a new Wind/U product to meet its customers' needs.

Further, Bristol has demonstrated that it will clearly suffer significant if not complete loss of goodwill if it does not obtain the NT 5 source code immediately. *See Tom Doherty*, 60 F.3d at 38. Its reputation as a company capable of developing and maintaining a product that can port Windows-based applications to UNIX-based systems is presently being damaged. Without the preliminary relief it seeks, Bristol cannot assure its customers that it will, at the time NT 5 is released, have a Wind/U product that will port the NT 5 applications they are now writing.

Microsoft argues that, because Bristol has done well in its business over the last two years without having received any new code, it cannot now show irreparable harm. This argument is without merit. Over the past two years, Bristol, its customers and Microsoft all expected Bristol to receive NT 5 source code and to be able to develop a Wind/U product for NT 5 prior to its release date. So long as the issue date of NT 5 was at least six to eight months in the future, these expectations were reasonable because Bristol had sufficient time to receive the code and develop a Wind/U product for NT 5. Thus, no goodwill was being lost. This is not the situation today. The fact that any harm Bristol faced over the last year was not imminent and irreparable is not inconsistent with a finding that it now faces such harm. Contrast *Rodriguez v. DeBuono*, 162 F.3d 56, 61 (2d Cir.1998) (per curiam) (holding that entry of preliminary injunction based on finding of irreparable harm, followed by entry of stay that required finding of no such harm, is error).

Finally, Microsoft argues that this court is required to find a lack of irreparable harm because Bristol delayed in commencing this action and is itself the cause of any

harm that it now claims to suffer. The court agrees that either delay or self-inflicted harm can be fatal to a motion for a preliminary injunction. *See Citibank, N.A. v. Citytrust*, 756 F.2d 273, 277 (2d Cir.1985) (holding that delay in prosecuting a claim of infringement vitiates an assertion of irreparable harm). *But see Tom Doherty*, 60 F.3d at 39–40 (finding irreparable harm despite some delay in plaintiff seeking to enforce its alleged rights). However, the facts do not support a finding of unreasonable delay or self-inflicted harm here.

First, whatever delay there was in commencing this case is explainable. There is evidence that Bristol began considering a lawsuit several months before eventually filing one. Given the complexity of the legal and factual issues raised by this litigation, however, this court does not find such a delay unreasonable. Satisfaction of their obligations under the Rules of this court could have taken counsel and plaintiff some significant period of time. Further, Microsoft was negotiating with Bristol into August to reach a new contract. Bristol is entitled to attempt to avoid the harm alleged here through negotiation instead of litigation. *Tom Doherty*, 60 F.3d at 39.

Microsoft's "self-inflicted" argument also fails. The fact that Bristol refused to accept the contract terms for an "apple core" of NT 5 source code cannot mean that Bristol caused itself the harm of which it complains. Bristol claims that, even if it signed the limited WISE extension offered by Microsoft, competition would have been injured because the offered terms have an anticompetitive intent and effect. Although the ultimate determination of the merits of that argument must await trial, Bristol's assertion and evidence offered in support of it are sufficient to undercut any suggestion that Bristol caused itself the

estimated that there will be 100,000 applications for NT 5. There were 45 applications

that could run on Windows 95 when it was released.

harm it complains of by not accepting the proffered contract terms.

Therefore, the court finds that Bristol has established that it is likely to suffer irreparable harm before this case can be tried. The court must now address whether Bristol has clearly shown a likelihood of success on the merits.[22]

## C. Likelihood of Success on the Merits.

### 1. *Antitrust Standing and Injury.*

Before turning to the particular antitrust claims asserted by Bristol, the court must determine if Bristol has made a clear showing that it has antitrust standing to assert those claims, *Automated Salvage Transport, Inc. v. Wheelabrator Environmental Sys., Inc.*, 155 F.3d 59, 78–79 (2d Cir.1998); *Calderone Enters. Corp. v. United Artists Theatre Circuit*, 454 F.2d 1292, 1295 (2d Cir.1971), and that it claims an injury of the type the antitrust laws are designed to prevent. *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 109–11, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986); *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Unless Bristol can demonstrate both standing and injury, it cannot maintain an antitrust claim.[23]

### a. *Antitrust Standing.*

■ The Supreme Court has identified five factors to be considered in determining whether a party has antitrust standing:

(1) the causal connection between the antitrust violation and the harm to the plaintiff, and whether the harm was intended;

(2) the nature of the injury, including whether the plaintiff is a consumer or competitor in the relevant market;

(3) the directness of the injury, and whether the damages are too speculative;

(4) the potential for duplicative recovery, and whether the apportionment of damages would be too complex; and

(5) the existence of more direct victims.

*Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 538–544, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).[24] This articulation elaborated on a prior decision, in which the Court cautioned against "cabin[ing] § 4 in ways that will defeat its broad remedial objective." *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 477, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982). With this direction in mind, the court turns to the allegations in this case.

There can be little question of the causal connection between the alleged antitrust violation and the harm to Bristol. Bristol has challenged Microsoft's refusal to li-

---

**22.** In this opinion, the court sometimes shortens this standard to "a clear showing" with regard to an issue. It is intended that this should be read as "a clear showing of a likelihood of prevailing at trial" on that issue.

**23.** The court assumes for purposes of this discussion that an antitrust violation has occurred. *National Assoc. of Pharmaceutical Mfrs., Inc. v. Ayerst Labs.*, 850 F.2d 904, 914 (2d Cir.1988).

**24.** *Associated General Contractors* outlines these antitrust standing requirements for claims brought under Section 4 of the Clayton Act, which are more comprehensive than the standing requirements for Section 16 claims. *See Cargill*, 479 U.S. at 111 n. 6, 107 S.Ct. 484. ("[B]ecause standing under § 16 raises no threat of multiple lawsuits or duplicative

recoveries, some of the factors other than antitrust injury that are appropriate to a determination of standing under § 4 are not relevant under § 16.").

In the underlying claim, Bristol seeks both treble damages under Section 4 and injunctive relief under Section 16 of the Clayton Act. It must make a clear showing that it at least has standing to bring its Section 16 claim to prevail on the preliminary injunction motion presently before the court. Because the court finds that Bristol has met the more stringent requirements for a Section 4 damage case, it has clearly demonstrated that it has standing for purposes of the equitable relief sought in its motion for a preliminary injunction under Section 16.

cense sufficient source code for NT 5 to make UNIX–plus–Wind/U a viable competitor to Windows NT 5. The harm to Bristol through loss of sales and goodwill is not merely causally connected: it is directly connected. *See Crimpers Promotions, Inc. v. Home Box Office,* 724 F.2d 290, 294 (2d Cir.1983). Moreover, there is ample evidence that Microsoft intended to harm Bristol with respect to limiting the effectiveness of its Wind/U product.

Therefore, not only is the first factor of *Associated General Contractors* present, but the third is as well. Bristol's injury is a direct result of Microsoft's alleged antitrust behavior. It could be argued that the amount of lost Wind/U sales may be difficult to establish; it cannot be argued, however, that such damages are speculative.

In addition, there is no real risk of double recovery. This fourth *Associated General* factor rests on the concern addressed at length by the Supreme Court in *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). In that case, the consequence of the anticompetitive behavior was passed on by the direct purchaser to its customer in the form of a higher price. Thus, the same injury was suffered first by the original purchaser and then by subsequent purchasers. In the present case, as in *McCready* and *Crimpers,* Bristol alleges an injury that is neither the same injury, nor a "pass on" of any injury that other potential victims may suffer. *See McCready,* 457 U.S. at 465–66, 102 S.Ct. 2540; *Crimpers,* 724 F.2d at 293–94. The destruction of Bristol's entire cross-platform business is different in kind and degree from the loss of sales or market share that makers of UNIX-based op-

erating system companies may face as a result of the conduct alleged. Thus, the potential for double recovery is virtually nonexistent.

With regard to the fifth factor, there are clearly other victims, most obviously the makers of UNIX-based operating systems. However, the alleged anticompetitive behavior has no more direct victim than Bristol. Even if it is assumed that Microsoft's behavior is part of its strategy to eliminate all UNIX-based operating systems, Microsoft has allegedly chosen the elimination or weakening of cross-platform makers, like Bristol, as a means to accomplish that end.

The last factor to be addressed, the nature of the injury, is the one most vigorously attacked by Microsoft. It argues that Bristol does not have standing because it is not a consumer or competitor of Microsoft's. This court is not persuaded that only competitors and customers, as traditionally understood, have standing. *See Crimpers,* 724 F.2d at 292 ("[A] plaintiff need not be a direct competitor in the market in which defendants operate."). However, based on the evidence before it at this time, the court finds that Bristol has clearly shown that it is indeed a competitor of Microsoft.

By providing an extension to the UNIX-based operating system, Bristol competes with Microsoft directly.[25] In selling Wind/U to OEMs and ISVs, Bristol theoretically makes all Windows applications operable on UNIX systems. Given that 60,000 applications will be available when the NT 5 operating system reaches market, and given the consumer acceptance generally of the Windows "environment," Bristol must be recognized as more than a mere supplier.[26] Bristol offers a product

---

**25.** As part of its argument, Microsoft contends that Bristol cannot be Microsoft's competitor because, if it is, then all companies that write software are Microsoft's competitors. See Declaration of Richard L. Schmalensee at ¶ 16. However, not all software enables an operating system, like UNIX, to run applications written for a different operating system. It is this aspect of the Wind/U prod-

uct that makes Bristol a competitor of Microsoft as a seller of operating systems.

**26.** Microsoft's own internal communications reflect its view of Bristol as a "competitor" and acknowledge the risk that cross-platforms, like Wind/U, pose to the success of the NT operating system in the workstation and server markets. Specifically, the cross-plat-

that makes a UNIX operating system competitive with Microsoft's operating systems in a way that a UNIX operating system alone is not. *See Image Technical Services, Inc. v. Eastman Kodak Co.,* 125 F.3d 1195, 1204 (9th Cir.1997), *cert. denied,* ── U.S. ──, 118 S.Ct. 1560, 140 L.Ed.2d 792 (1998). Thus, Bristol has standing to assert its claims under the antitrust laws.

### b. *Antitrust Injury.*

■ Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick,* 429 U.S. at 487, 97 S.Ct. 690. Analyzing antitrust injury forces courts "to connect the alleged injury to the purposes of the antitrust laws." II Phillip E. Areeda. & Herbert Hovenkamp, *Antitrust Law* ¶ 362, at 210 (rev. ed.1995).

Assuming that a violation has occurred,[27] Bristol has made a clear showing that it has suffered an antitrust injury. The gravamen of Bristol's claim is that Microsoft has used its monopoly power in one market to gain an unfair competitive advantage over Bristol in two other, related markets. Bristol further alleges that Microsoft's refusal to license its full source code is an anticompetitive act that will serve to diminish the level of competition in those two markets.

The harm caused by a monopolist's anticompetitive acts, such as those alleged here, constitute precisely the type of injury that the antitrust laws were designed to prevent. In addition, the harm from such acts flows directly from the anticompetitive effect of the challenged behavior. Unlike the plaintiff in Brunswick, Bristol does not seek damages for lost profits it would have received if competition had been reduced. *Cf.* 429 U.S. at 488, 97 S.Ct. 690. Rather, Bristol claims that competition with Microsoft will be lessened due to Microsoft's allegedly anticompetitive refusal to license its complete source code. Bristol has thus shown a substantial likelihood that it will be able to prove antitrust injury at trial.

Microsoft's arguments to the contrary misperceive Bristol's claim and the concept of antitrust injury under Section 2.[28] A Section 2 plaintiff need show only that the injury is "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick,* 429 U.S. at 488, 97 S.Ct. 690. "[T]he antitrust laws do not require a plaintiff to establish a market-wide injury to competition as an element of standing." *Doctor's Hosp. of Jefferson, Inc. v. Southeast Med. Alliance, Inc.,* 123 F.3d 301, 305 (5th Cir.1997). Moreover, even if such injury to competition were required to establish antitrust injury in Section 2 claims, Bristol has demonstrated such injury. Bristol has alleged that Microsoft's acts have not only injured Bristol, but have damaged competition in the operating systems markets generally. *See* Complaint at ¶ 70 ("The intended purpose

form capacity of Wind/U threatens to strengthen the market appeal of UNIX and to neutralize the competitive functionality NT 5 would offer over UNIX. Clearly, Microsoft recognized the potential of Bristol, through its Wind/U sales to makers of UNIX operating systems and their users, to lessen Microsoft's sales. *See Hayden Pub. Co. v. Cox Broadcasting Corp.,* 730 F.2d 64, 71 (2d Cir.1984).

27. *See supra* note 23.

28. Microsoft cites four circuit court decisions in support of its argument that Bristol must show an actual, market wide adverse effect on competition, and not just harm to itself, to establish antitrust injury: *Tops Markets, Inc. v. Quality Markets, Inc.,* 142 F.3d 90, 96–97 (2d Cir.1998); *Electronics Communications Corp. v. Toshiba Am. Consumer Products, Inc.,* 129 F.3d 240 (2d Cir.1997); *Balaklaw v. Lovell,* 14 F.3d 793 (2d Cir.1994); and *Trans Sport, Inc. v. Starter Sportswear, Inc.,* 964 F.2d 186, 190–91 (2d Cir.1992). The first three are cited for their discussions of the requirements of a Sherman Act Section 1, not Section 2, cause of action. The fourth case cited, *Trans Sport,* although a Section 2 case, is concerned at the pages cited with the issue of whether the defendant's conduct was an unreasonable exercise of its monopoly power, not with antitrust injury. Therefore, these cases are inapposite to the analysis here.

and the effect of Microsoft's course of conduct with regard to Bristol is to eliminate competition from UNIX and other non-Windows operating systems in the long run."). If Bristol prevails on its claims, then it will have proven harm of the sort the antitrust laws are designed to prevent, not just to itself, but to competition in general.

### 2. *Section 2 Monopolization Claims.*[29]

Bristol asserts the following claims of monopolization under Section 2 of the Sherman Act: (1) that Microsoft has leveraged its monopoly power in the personal computer operating system market to gain an advantage in the technical workstation and departmental server operating systems markets; (2) that Microsoft's refusal to deal with Bristol constitutes a willful anticompetitive practice in the technical workstation operating system market; and (3) that Microsoft's refusal to deal with Bristol constitutes a willful anticompetitive practice in the departmental server operating system market.[30] *See* Complaint at ¶¶ 63–79. For the reasons that follow, this court finds that Bristol has not made a clear showing of likelihood of success on any of its monopolization claims which is required for the issuance of the preliminary injunction sought in this case.

### a. *Relevant Markets*

In order to assess whether there has been a substantial showing that Bristol will be able to establish that Microsoft has monopoly power, it is first necessary to define the relevant markets at issue. *See Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 268 (2d Cir.1979). Bristol alleges in its Complaint that there are three relevant markets: the personal computer operating system market, the market for technical workstation operating systems, and the market for departmental server operating systems.[31] Complaint at ¶ 21. Bristol offered credible and detailed evidence in support of the existence of these three relevant markets.[32]

Microsoft disputed the existence of three markets, suggesting there was essentially only one operating systems market. Microsoft's expert testified that there either is now, or will soon be, such an overlap between the three markets that in reality there exists one market for all operating systems, exclusive of the very high end of the technical workstation operating system market. Dr. Langlois did not strongly disagree about the future, although it was his opinion that, at present, there were still three separate markets.

It may develop that the three markets merge into one.[33] However, the court accepts as of now the analysis of Dr. Langlois concerning current buyer reaction to a price increase, *Hayden Publishing Co. v. Cox Broadcasting Corp.,* 730 F.2d 64, 71

---

29. This section and the one that follows discuss Bristol's claims under Section 2 of the Sherman Act (the First through Sixth Claims). Because the Connecticut Antitrust Statute, Conn.Gen.Stat. § 35–27, mirrors the federal anti-monopoly statute, *Shea v. First Fed. Sav. & Loan Ass'n of New Haven,* 184 Conn. 285, 303–04, 439 A.2d 997 (1981), the analysis in these sections is also applicable to Bristol's state law antitrust claims (the Seventh through Twelfth Claims).

30. In its Fourth Claim, Bristol alleges a violation of Section 2 based on the theory that Microsoft's refusal to deal constituted denial of access to an essential facility. Complaint at ¶¶ 80–85. Bristol does not press that claim as a ground upon which to rest the issuance of a preliminary injunction. *See* Bristol's

Summary of Proof at 4. Therefore, the court will not address that claim at this time.

31. It is uncontested that the geographic scope of each product market is worldwide.

32. See Testimony and Declaration of Professor Langlois.

33. Microsoft announced on October 27, 1998 that NT 5 will be renamed Windows 2000 at release and that it is Microsoft's intention that NT 5/Windows 2000 will serve as the basis for all Microsoft PC operating systems "from consumer products to the highest-performance servers." Given that NT 5/Windows 2000 is expected to have greater capabilities than current Microsoft products, there may well be only one market in the future.

(2d Cir.1984), and substitutability, *U.S. v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). Based upon his written and live testimony, this court finds that Bristol has made a clear showing that it is likely to establish at trial that there are now three relevant operating system markets at issue.

### b. *Monopoly Leveraging.*

▮ In the first of its three monopolization claims, Bristol alleges that Microsoft is engaged in impermissible "leveraging," i.e., that Microsoft is using its market power in the personal computer operating system market to "gain a competitive advantage and secure a monopoly in the technical workstation operating system market and departmental server operating system markets." Complaint at ¶ 64. Specifically, Bristol argues that Microsoft used its control of the personal computer operating system market to regulate the supply and cost of application programs in the other two operating systems markets. Even if this court assumes that, with more than 90% of the personal computer operating system market, Microsoft has monopoly power in that market, Bristol is not entitled to a preliminary injunction on this claim. It has not clearly shown that it will likely establish at trial that Microsoft leveraged that monopoly power to gain an unfair advantage in either of the other two markets.

Under the monopoly leveraging doctrine, formulated by the Second Circuit in *Berkey Photo*, "the use of monopoly power attained in one market to gain a competitive advantage in another is a violation of Section 2, even if there has not been an attempt to monopolize the second market." 603 F.2d at 276. This court assumes, for purposes of this decision, that monopoly leveraging as formulated in *Berkey* remains a viable doctrine.[34]

Here, Bristol argues that Microsoft has gained a "competitive advantage" in the two other markets by use of the monopoly power that it allegedly possesses in the personal computer operating system market. However, Bristol has failed to make a substantial showing that it will establish at trial that Microsoft has somehow forced ISVs to write to Windows. As was noted in *Berkey Photo*, "a large firm does not violate Section 2 simply by reaping the competitive rewards attributable to its efficient size, nor does an integrated business offend the Sherman Act whenever one of its departments benefits from association with a division possessing a monopoly in its own market." *Id.* at 276.

Bristol has not clearly shown on this record that any advantage possessed by Microsoft in either of the two non-personal computer markets was obtained through coercive use of monopoly power in the personal computer market, rather than simply through benefits that may accrue to Microsoft due to its product acceptance.[35]

**34.** It is not altogether clear whether the doctrine has survived the Supreme Court's decision in *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993) and the Second Circuit's decision in *Twin Labs., Inc. v. Weider Health & Fitness*, 900 F.2d 566 (2d Cir.1990). Although *Spectrum Sports* did not address the monopoly leveraging doctrine directly, the Court rejected the concept that Section 2 could ever be implicated without actual monopolization or a dangerous probability thereof. *Spectrum Sports*, 506 U.S. at 459, 113 S.Ct. 884 ("[Section] 2 makes the conduct of a single firm unlawful *only when* it actually monopolizes or dangerously threatens to do so.") (emphasis added). Similarly, the Second Circuit's opinion in *Twin Labs*, while not explicitly overruling *Berkey Photo*, described part of the decision as "dictum." Further, *Twin Labs* could be read to suggest that a plaintiff in a monopoly leveraging claim must demonstrate "tangible harm to competition" in order to prevail. *Twin Labs.*, 900 F.2d at 570–71. Because Bristol has not made a clear showing of success on the merits under the more favorable *Berkey Photo* standard, this court need not at this time resolve the question of whether *Berkey Photo* has been limited by *Twin Labs* or overruled *sub silentio* by *Spectrum Sports*.

**35.** Bristol has acknowledged that Windows is far and away the single most attractive choice for an ISV. Bristol's Post–Trial Summary of Proof at 14.

Accordingly, Bristol is not entitled to a preliminary injunction based on its leveraging claim.[36]

### c. *Monopolization of the Technical Workstation and Departmental Server Operating Systems Markets.*

■ Bristol next claims that Microsoft has monopolized the markets for technical workstation operating systems and departmental server operating systems in violation of Section 2. The Supreme Court has defined the offense of unlawful monopolization under Section 2 as having two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).

■ Turning to the first element of Bristol's Section 2 monopolization claims, the issue at this preliminary injunction stage is whether Bristol has shown a substantial likelihood that it will be able to prove that Microsoft has monopoly power in either of these two markets. Monopoly power is understood to be the ability to control prices in, or to exclude competitors from, the relevant market. *Aspen Highlands*, 472 U.S. at 596 n. 20, 105 S.Ct. 2847; *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). A plaintiff is not required to prove that a firm controlled prices or excluded competitors; it is the mere ability to do so that satisfies this element. *United States v. Griffith,*

334 U.S. 100, 107, 68 S.Ct. 941, 92 L.Ed. 1236 (1948) (stating that monopoly power may be unlawful under Section 2 "even though it remains unexercised"); *American Tobacco Co. v. United States,* 328 U.S. 781, 811, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946) ("[T]he material consideration in determining whether a monopoly exists is not that prices are raised and that competition actually is excluded, but that power exists to raise prices or to exclude competition when it is desired to do so.").

In evaluating market power, there is a "long-standing tradition" of associating market power with market share.[37] 2 Julian O. von Kalinowski et al., *Antitrust Laws and Trade Regulation*, § 25.03[2], at 25–18 (2d ed.1998). This tradition is traceable to Judge Learned Hand's seminal decision in *United States v. Aluminum Co. of America ("Alcoa"),* 148 F.2d 416, 424 (2d Cir.1945) ("[A] percentage [of over ninety percent] is enough to constitute a monopoly; it is doubtful whether sixty or sixty-four percent would be enough; and certainly thirty-three percent is not."). After the *Alcoa* decision, the Supreme Court expressly recognized that market share can support a finding of monopoly power. *Grinnell,* 384 U.S. at 571, 86 S.Ct. 1698 ("The existence of [monopoly] power ordinarily may be inferred from the predominant share of the market."); *see also Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 464, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992).

Nonetheless, it is the better course to consider market share in the context of the market in question. *United States v. Co-*

---

**36.** Bristol also argues that it is unlawful under *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985), for a monopolist in one market "to refuse to continue a pro-competitive arrangement" in another. Bristol's Post-Trial Summary of Proof at 34–35. In essence, Bristol's theory of liability combines the monopoly leveraging doctrine of *Berkey Photo* with the "refusal to deal" liability of *Aspen Highlands.* No court has so extended the monopoly leveraging doctrine. Particu-

larly in light of the recent doubt cast on *Berkey Photo, see supra* note 34, this court declines to be the first to do so.

**37.** Monopoly power may also be proven by direct evidence that prices were controlled or that someone was excluded from the market. *Tops Markets, Inc. v. Quality Markets, Inc.,* 142 F.3d 90, 98 (2d Cir.1998). At this preliminary injunction stage, no such evidence has been adduced.

*lumbia Steel Co.,* 334 U.S. 495, 528, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948) ("The relative effect of percentage command of a market varies with the setting in which that factor is placed."); *see also Los Angeles Land Co. v. Brunswick Corp.,* 6 F.3d 1422, 1425 (9th Cir.1993) (holding that 100% share did not support finding of monopoly power in market). In deciding when market share evidences monopoly power in a particular market, courts have looked to, *inter alia,* the relative size and strength of the defendant and its competition, changes in the defendant's market share, consumer demand, and barriers to entry. *See Hayden Pub. Co. v. Cox Broadcasting Corp.,* 730 F.2d 64, 68 (2d Cir.1984); *Broadway Delivery Corp. v. United Parcel Serv. of America, Inc.,* 651 F.2d 122, 128 (2d Cir.1981); *Berkey Photo,* 603 F.2d at 273.

■ With respect to the requisite element of monopoly power, Microsoft's actual market shares for the last year available (1997) are 28% of new shipments in the technical workstation operating system market and 44% of new shipments in the departmental server market. The projected percentages for 1998 are 43% and 49%, respectively. *Id.* Microsoft did not contest these numbers.

Microsoft's 28% share in the technical workstation operating system market precludes a finding that Bristol has clearly shown a likelihood that it will establish that Microsoft has monopoly power in that market at trial. *See United Air Lines, Inc. v. Austin Travel Corp.,* 867 F.2d 737, 742 (2d Cir.1989) (holding that firm with 31% market share "lacks the market power necessary to constitute a[ ] monopoly"); 2 von Kalinowski et al., *supra,* § 25.03[3][b], at 25–30 ("[C]ourts have held that a low market share (generally below 40%) either precludes a finding of monopoly power or requires a finding of no monopoly power."). The percentage of the departmental server operating system market controlled by Microsoft, however, falls in that range of 40% to 70% where courts have split over whether market share alone will establish market power. *See id.* at 25–30 to 25–32. Thus, an analysis of the market characteristics for the departmental server operating system market is appropriate.

■ The departmental server operating system market has high barriers to entry.[38] Despite these barriers, Microsoft's share has grown significantly in a short period of time. Microsoft's share grew in this market from less than 1% in 1993 to a projected nearly 50% in 1998. Finally, there is a "network" effect involved with operating system markets which increases the barriers to entry.[39]

These market characteristics might support a finding of monopoly power even though market share is below 50%. However, given the standard that this court must apply in the context of this preliminary injunction motion, it cannot conclude that Bristol has made a clear showing of monopoly power in this market with a market share below 50%.[40]

---

**38.** For example, as of December 1997, Microsoft estimated that it had already spent $270 million in developing the NT 5 product version. Since that time, 2,000 developers have continued to work on the product.

**39.** Operating systems involve technical standards on which the production of a wide array of complementary products depends. The value to any one user of a standard depends on the number of others who also adopt that standard. A standard that attracts a critical mass of users can gain sufficient momentum to drive out competing candidates and to establish itself as dominant. When network effects of this sort are present, users face high costs of switching away from a dominant standard.

**40.** Further supportive of the conclusion that Bristol has not clearly shown that Microsoft has monopolized these markets are the various predictions in the trade press that UNIX-based systems will continue to compete vigorously with Microsoft in these markets for the foreseeable future. These predictions were credited by the defendant's expert, Dr. Schmalensee. Several exhibits contain similar opinions by Bristol representatives.

Thus, Bristol has not demonstrated a substantial likelihood that Microsoft possesses monopoly power in either the technical workstation or departmental server operating system market. Because proof of monopoly power is an essential element of Bristol's monopolization claims, *see Grinnell*, 384 U.S. at 570–71, 86 S.Ct. 1698, no mandatory preliminary injunction can issue on Bristol's monopolization claims.

### 3. *Attempted Monopolization.*

■ Section 2 prohibits not only monopoly but also unilateral attempts to monopolize. 15 U.S.C. § 2. In its Complaint, Bristol alleges that Microsoft has violated Section 2 by attempting to monopolize both the technical workstation and departmental server operating systems markets.[41] Complaint at ¶¶ 86–95. To prevail on these claims, Bristol must prove as to each market: (1) a specific intent to monopolize; (2) predatory or anticompetitive conduct; and (3) a dangerous probability of success in achieving monopoly power. *Spectrum Sports*, 506 U.S. at 459, 113 S.Ct. 884; *H.L. Hayden Co. of New York v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1017 (2d Cir.1989). Because Bristol has not made a clear showing that it will prevail at trial on the third element, no mandatory preliminary injunction can issue on its attempted monopolization claims.

■ In order to establish a dangerous probability of success in achieving monopoly power, a plaintiff must be able to show, *inter alia*, "a realistic probability that the defendant[ ] could achieve monopoly power in th[e] market." *Spectrum*, 506 U.S. at 459, 113 S.Ct. 884. In considering that probability, the court employs the same concept of market power that is used in a claim of completed monopolization. *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 100 (2d Cir.1998). However, "[d]espite the similar approaches, a lesser degree of market power may establish an attempted monopolization claim than that

necessary to establish a completed monopolization claim." *Id.*

■ The Second Circuit has upheld a finding of dangerous probability where the firm had 55% of the market at the time of its predatory conduct. *Kelco Disposal, Inc. v. Browning–Ferris Indus. of Vermont, Inc.*, 845 F.2d 404, 409 (2d Cir.1988), *aff'd on other grounds*, 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989). However, the Circuit has also held that a market share of less than 50% precludes a finding of dangerous probability absent "significant evidence concerning the market structure to show that the defendant's share of that market gives it monopoly power." *Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc.*, 651 F.2d 122, 129 (2d Cir.1981).

Turning first to the market for operating systems for technical workstations, this court notes that the projections relied on by both sides show Microsoft's market share growing from 28% of new shipments in 1997 to nearly 60% of such shipments in 2002. The growth is dramatic as projected from 1997 to 1998 (more than 50% growth in market share, or from 27.8% to 43.3%) and from 1998 to 1999 (almost 20% growth, or from 43.3% to 51.8%). After 1999, the rate of growth, both as an absolute increase in percentage share and in relation to the prior years, is projected to continue to slow, although Microsoft's absolute market share is projected to continue to grow.

With respect to the server operating system market, the projections show Microsoft growing in market share from 43.7% in 1997 to 64.9% in 2002. Here, the growth is projected to be relatively steady from 1997 to 2000, at approximately 10% per year, but is then projected to drop to less than 5% per year through 2002.

The current market share numbers are not in and of themselves sufficient to sup-

---

**41.** Bristol has also asserted parallel state law claims. Complaint at ¶¶ 108–13. *See supra* note 29.

port a showing of dangerous probability. *Broadway Delivery Corp.*, 651 F.2d at 129. Further, although the absolute, 2003 projected numbers might help support such a finding, the projections actually undercut Bristol's theory on dangerous probability. In support of his conclusion that there is a "dangerous probability" here, Dr. Langlois testified that, once a standard in an operating system market gains a "critical mass of adherents," a phenomenon referred to as "tipping" occurs. In effect, the growth in market share after that critical mass is obtained would be expected to be substantial, even in relationship to the prior growth, because the standard would become so attractive and in use by so many that other standards would be overwhelmed.[42]

However, the projections used by Dr. Langlois do not support a finding of tipping in these markets. After rapid growth in the next year or two, the rate of growth is projected to slow substantially. Of course, it may be that tipping will occur farther out in time, but the present record cannot support such a finding, nor would a period of more than five years satisfy the realistic probability requirement of this element.[43] *See Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal and Prof'l Publications, Inc.*, 63 F.3d 1540, 1544 (10th Cir.1995) (measuring market share at time of offense or during period of alleged offense).

There was evidence offered about the meteoric growth in Microsoft's market share in the personal computer operating system market in the 1990s. The historic experience in the personal computer market may support a finding, contrary to the post–2000 projections, that the same meteoric growth is likely to occur in the technical workstation and server operating systems markets. However, the record does not clearly show that these other two markets will behave in all material respects similar to the personal computer operating system market, such that the experience in one market can serve as a reliable predictor of the result in the other markets.

Therefore, it is the conclusion of this court that Bristol has not clearly shown that it is likely to prevail at trial on the issue of dangerous probability of success in Microsoft achieving monopoly power in either the technical workstation operating system market or the departmental server operating system market.[44] Thus, Bristol is not entitled to entry of a preliminary injunction on its claims for attempted monopolization.

### F. Promissory Estoppel.

Bristol also asserts that Microsoft is promissorily estopped from withholding Windows NT 4 and 5 source code from Bristol. In support of this claim, Bristol alleges that it reasonably relied on Microsoft's public and private assurances that it would make new Windows source code available for a term longer than its contract provided. For the following reasons, Bristol is not entitled to a preliminary injunction based on its promissory estoppel claim.

To prevail on a claim of promissory estoppel, Bristol must show (1) that it reasonably and detrimentally relied on representations made by Microsoft, and (2) that those "representations [were] sufficiently promissory [and] sufficiently definite to support contractual liability." *D'Ulisse–Cupo v. Board of Dirs. of Notre*

---

**42.** Microsoft's CEO refers to this phenomenon as a "success loop."

**43.** The continued vitality of UNIX also raises doubt about the existence of a dangerous probability that Microsoft will achieve monopoly power in these two markets. *See supra* note 40.

**44.** In light of this conclusion, this court need not address whether Bristol has clearly shown a specific intent to monopolize and anticompetitive or predatory conduct.

*Dame High School*, 202 Conn. 206, 214, 520 A.2d 217 (1987); *see Connecticut Nat'l Bank v. Voog*, 233 Conn. 352, 366, 659 A.2d 172 (1995); *Wellington Sys., Inc. v. Redding Group, Inc.*, 49 Conn.App. 152, 162, 714 A.2d 21 (1998). Courts have interpreted this second element narrowly, requiring that the promise manifest a "present intention on the part of the defendant[ ] to undertake immediate contractual obligations to the plaintiff." *D'Ulisse–Cupo*, 202 Conn. at 214–15, 520 A.2d 217.

[18] First, based on the evidence presently before the court, Bristol has not made a clear showing that the promises made by Microsoft are sufficiently promissory and definite. Bristol argues that the WISE agreement was understood by both parties to be "a clear and definite promise that Microsoft would continue to provide up-to-date source code on terms substantially equivalent to the 1994 agreement." Bristol's Reply Mem. at 35. The WISE contract that Bristol entered into with Microsoft, however, specifically provided for the delivery of source code for only three years and only for product version 3 of Windows NT. Further, none of the evidence with respect to the WISE program demonstrates that Microsoft provided any material terms in its public or private statements nor expressed an intent to undertake immediate contractual obligations for future versions of the operating system. Statements that Microsoft was committed to providing WISE partners with Windows source code for the "long-term" or "well into the future" are not sufficiently clear or definite to have reasonably induced the reliance that Bristol asserts, particularly when compared to the clarity and precision of the WISE contract itself.[45]

Second, even if Microsoft had made statements regarding access to source code for future versions of the Windows NT operating system that were sufficiently clear and definite, Bristol has not made a clear showing that its actions, i.e., entering into the WISE agreement, rewriting Wind/U software and changing its pricing structure, were taken in reliance on such statements. Most of the statements about the WISE program that were submitted to the court were made *after* Bristol had entered into the WISE agreement and therefore could not have been relied upon by Bristol. In fact, Bristol submitted only one exhibit that included a public statement about the WISE program made by Microsoft prior to the time that Bristol signed the agreement. *See* PX 386. As discussed above, this statement cannot be said to be sufficiently clear or definite to induce Bristol to change its position. Bristol also indicated that it decided to sign the agreement, at least in part, because its direct competitor, Mainsoft, had signed a WISE agreement and because it knew that such an agreement would provide a marketing advantage over other competitors.

Moreover, Bristol has not made a clear showing that it was harmed by its reliance on any promises made by Microsoft. For example, it has not clearly established that any harm it has suffered has not been outweighed by the advantages it received by entering into its Agreement with Microsoft. Microsoft's assessment of Wind/U prior to the existence of any agreement noted areas in which Wind/U could be improved if Bristol has access to

---

**45.** In its Reply Memorandum, Bristol suggests that the court should adopt the less stringent standard articulated in the Restatement (Second) of Torts §§ 872 and 894 for purposes of deciding whether the promise made by Microsoft is sufficient to require Microsoft to renew the 1994 WISE agreement on similar terms. Section 872 of the Restatement deals with tortious acts committed in reliance on misrepresentations regarding the ownership or disposition of property for which the person making such misrepresentations is subject to liability as if the statements were true. Section 894 provides a defense for a non-tortious act committed in reliance on misrepresentations of fact. Without deciding whether these sections are relevant to Bristol's claims, the court declines to apply these Restatement standards given that Bristol has not cited, nor has the court been able to find, any Connecticut appellate cases adopting them.

Microsoft's source code. In addition, Bristol has stated that "other companies such as Software Pundits and Willows Software [were] offered Windows programming interface on UNIX cross-platform tools, but did not enter into WISE Agreements; these companies were never able to compete effectively with Bristol and MainSoft, and eventually went out of the cross-platform toolkit business." Keith Blackwell's Declaration at ¶ 43. Bristol has simply not made a clear showing that it would have been any better off had it never done business with Microsoft.

Thus, Bristol has failed to make a substantial showing that it is likely to prevail on its claim that Microsoft is estopped from withholding the Windows source code.

### G. CUTPA.

Bristol has alleged that Microsoft engaged in unfair methods of competition in violation of the Connecticut Unfair Trade Practices Act ("CUTPA").[46] Conn.Gen. Stat. § 42–110a–q. Complaint at ¶¶ 114–120. Bristol alleges that Microsoft's representations that it was committed to providing source code for the latest releases of its operating systems to Bristol and Mainsoft, combined with Microsoft's subsequent refusal to renew the WISE agreement on commercially reasonable terms, constitute unfair trade practices. *Id.* At this point in the litigation, however, Bristol has not clearly established a substantial likelihood that it will prevail on the merits of this claim.

 In analyzing whether a practice is unfair under CUTPA, the Connecticut Supreme Court has adopted the criteria set out in the "cigarette rule" by the Federal Trade Commission:

(1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businessmen].

*Cheshire Mortgage Service, Inc. v. Montes,* 223 Conn. 80, 105–06, 612 A.2d 1130, (1992) (internal quotation marks omitted; alterations in the original). In announcing this standard, the court noted that "[a]ll three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Id.* at 106, 612 A.2d 1130. In addition, standards for determining whether an act is unfair "must be formulated to discriminate between normally acceptable business behavior and conduct that is unreasonable or unacceptable." *E.I. du Pont De Nemours & Co. v. FTC,* 729 F.2d 128, 138 (2d Cir.1984).[47]

 Here, Bristol has not made a clear showing that it is likely to prevail at trial under any of the three parts of the CUTPA standard. With regard to the standard's first prong, Bristol has not clearly shown that Microsoft's actions offend public policy. An incipient violation of the antitrust laws, or conduct close to a violation of the antitrust laws, or conduct contrary to the spirit of the antitrust laws,

**46.** Bristol has pled a violation based on various "unfair" acts. Because it has not pleaded that Microsoft's acts were also deceptive, this court's analysis will focus only on the question of unfairness under CUTPA.

**47.** Although this case concerned Section 5 of the FTC Act rather than CUTPA, essentially the same criteria have been used under both statutes to evaluate whether an act is "unfair." Conn.Gen.Stat. § 42–110b(b) ("[I]n construing [CUTPA], ... the courts of this state shall be guided by interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the [FTCA], as from time to time amended.").

may be found to be "unfair" under CUT-PA, *see FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 239, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972); *FTC v. Brown Shoe Co.*, 384 U.S. 316, 321–22, 86 S.Ct. 1501, 16 L.Ed.2d 587 (1966); *du Pont*, 729 F.2d at 136–37.[48] However, Bristol has not clearly demonstrated that Microsoft's actions fall into any of these categories such that it is "unfair."

■■■ Certainly, the evidence before this court reveals that Microsoft wants its operating systems to prevail over UNIX-based operating systems in the marketplace. However, Microsoft's decision not to renew its contract with Bristol, even if made in furtherance of that goal, is not clearly anticompetitive. *du Pont*, 729 F.2d at 137–38 ("A line must [ ] be drawn between conduct that is anticompetitive and legitimate conduct that has an impact on competition."). Microsoft's conduct could be found to be merely neutral or competitive: Microsoft choosing how best to compete with UNIX. It is not necessarily "unfair" or anticompetitive for a non-monopolist to decide with whom and how to deal based on how it will be advanced in its own competitive position. *See Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 760–61, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984); *United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992 (1919) (holding that, in ab-

sence of purpose to monopolize, single entity may refuse to deal with any party it chooses). Nor is this a situation where Bristol has clearly shown that competition cannot exist between Microsoft and UNIX-based systems without Bristol having full access to all Microsoft's source code.[49] *Cf. Aspen Highlands*, 472 U.S. at 607–08, 105 S.Ct. 2847. Further, although Microsoft's "strategic" selection of source code suggests an anticompetitive intent, Bristol has not clearly shown on the record before this court that it is likely to prevail on establishing that intent at trial.

Further, although the absence of legitimate business justifications can support an inference of anticompetitive behavior, *see Aspen Highlands*, 472 U.S. at 608–11, 105 S.Ct. 2847, Microsoft has offered several business justifications for its conduct here. Some of Microsoft's explanations are questionable. However, this court cannot conclude that Bristol has clearly shown it will likely persuade the trier of fact that Microsoft had no business justification for its conduct. For example, Microsoft claims that it has become more protective of its intellectual property. Further, Microsoft asserts that the source code it refused Bristol was not needed for Bristol's customers. There is evidence to the contrary, but on the whole, Bristol has not clearly shown that these two explanations togeth-

---

48. These cases are all appeals from administrative proceedings before the FTC. It has been suggested that extending the FTC Act in this way is appropriate.

The policy bases for such an extension of the FTC Act relate to the fact that the FTC Act is enforceable only through an administrative process and not through private actions. Thus, one may assume the following: (1) that the agency possesses administrative expertise; (2) that the agency will proceed with a sense of broad public interest and not for individual interests; and (3) remedies under the FTC Act are likely to be more limited than under the antitrust law. This third factor seems significant because the more substantial antitrust remedies would not appear to be justifiable for marginal violations of law.

1 Langer, Morgan & Belt, *The Connecticut Unfair Trade Practices Act* 24 (1994). However, unlike the FTC Act, CUTPA is actionable by private parties, with remedies equivalent to those available under the antitrust laws. Conn.Gen.Stat. § 42–110g.

The court will analyze whether, on the record before it, the plaintiff has clearly shown a likelihood of success in establishing a "marginal" antitrust violation, without deciding at this time that such a cause of action is viable under CUTPA.

49. Although it was responding to Microsoft's request, Bristol did submit a list of less than all NT 5 source code that it stated it would accept in a new contract. A finder of fact could conclude from this that, at least at one time, it was Bristol's view that not all source code was needed to compete.

er are not a valid business justification. Finally, Microsoft introduced evidence to suggest that its past dealings with Bristol had made it reluctant to continue to deal with Bristol, which evidence might tend to support its decision to refuse to deal or to deal on a limited basis. Although the record currently supports the conclusion that Bristol is more likely than not to succeed in demonstrating that such alleged reluctance was not the real reason behind Microsoft's actions, it cannot be said that a clear showing has been made in this regard.

Thus, it is this court's conclusion that, under even the broadest concept of "unfairness" under CUTPA, the record does not clearly show that the plaintiff is likely to establish at trial that Microsoft has committed an unfair act in violation of the first prong of the cigarette rule.

■ Nor has Bristol made a clear showing that it is likely to prevail at trial on the issue of whether Microsoft's conduct is "immoral, unethical, oppressive, or unscrupulous." In *Cheshire Mortgage,* the Connecticut Supreme Court upheld a trial court finding that a violation of consumer protection statutes, in the absence of an intent to deceive, was not "immoral, unethical, oppressive or unscrupulous." *Cheshire Mortgage,* 223 Conn. at 112, 612 A.2d 1130. Even if Microsoft's decision not to renew the WISE agreement under its original terms is anticompetitive, without a showing of something more by Bristol, this court does not find that Bristol has clearly shown it will succeed at trial in establishing that such action was immoral, unethical, oppressive, or unscrupulous.

■ Bristol has also failed to clearly establish that Microsoft's actions have caused "substantial injury" to its competitors. With regard to the third criterion, not all injury to a competitor is legally "unfair." *McLaughlin Ford, Inc. v. Ford Motor Co.,* 192 Conn. 558, 569–70, 473 A.2d 1185 (1984). To satisfy CUTPA's third criterion, a plaintiff must show that: 1) the injury is substantial; 2) the injury outweighs any benefits to competition; and 3) the injury could not have been reasonably avoided. *Cheshire Mortgage,* 223 Conn. at 113, 612 A.2d 1130.

Bristol has not clearly shown that it will likely be able to establish this criterion's second element because it has not clearly shown that the harm from Microsoft's conduct outweighs its pro-competitive benefits. As was discussed above, there is evidence that competition in the relevant markets is projected to remain strong for the foreseeable future. *See supra* note 40. Microsoft's conduct could be viewed as a strategic decision designed to strengthen Microsoft's ability to compete in these markets in which there are now, and are expected to continue to be, other competitors.

Further, Bristol has not clearly shown that it could not have avoided the injury. It negotiated a contract with Microsoft in 1994. It has not clearly shown that it could not have avoided the injury by negotiating for a longer term or for more product version releases, and failing that, refused to accept the contract.

Because a plaintiff must establish all three elements under the third criterion, it cannot be said that Bristol has clearly shown that it is likely to prevail on the "substantial injury" prong of the cigarette rule. Because Bristol has failed to make a clear showing of likelihood of success on any one of the three cigarette rule tests, this court holds that a preliminary injunction cannot issue on Bristol's CUTPA claim.

## II. CONCLUSION

Based upon the foregoing analysis, it is the conclusion of this court that the plaintiff has clearly shown that it will suffer irreparable harm absent preliminary injunctive relief. Further, it is the conclusion of this court, based on the record before it, that the plaintiff has clearly demonstrated antitrust standing and injury. Finally, although it has raised at least

serious questions going to the merits, the plaintiff has not made a clear showing that it is likely to prevail at trial on its antitrust, common law and CUTPA claims.

Accordingly, this court DENIES Bristol's Motion for a Preliminary Injunction [Dkt. # 3]. Because of its finding of irreparable harm, the court sets the case down for trial commencing on June 1, 1999, in order to attempt to retain this court's ability to render a meaningful judgment should Bristol prevail and should the release date for NT 5 be later than this court now expects.

**SO ORDERED.**