**ICE CREAM LIQUIDATION, INC., formerly known as Fieldbrook Farms, Inc., individually and on behalf of all others similarly situated, Plaintiff,**

v.

**LAND O'LAKES, INC., Dairy Farmers of America, Inc., Associated Milk Producers, Inc., Grassland Dairy Products, Inc., Keller's Creamery LLC, and Madison Dairy Produce Company, Defendants.**

No. 3:02 CV 377 GLG.

United States District Court, D. Connecticut.

March 23, 2003.

Robert A. Izard, Jr., Schatz & Nobel, Hartford, CT, for Plaintiff.

Robert G. Oliver, David J. Crotta, Jr., Carolyn P. Gould, Mulvey, Oliver & Gould, New Haven, CT, Robert L. Keepnews,

Berman & Sable, Hartford, CT, Nathan P. Eimer, Lisa A. Meyer, Adam B. Deutsch, Eimer, Stahl, Klevorn & Solberg, Chicago, IL, for Defendants.

## OPINION

GOETTEL, District Judge.

Plaintiff, Ice Cream Liquidation, Inc., has brought this antitrust action on behalf of itself and a putative class[1] of domestic wholesale purchasers of milk, cream or butter, alleging that defendants conspired to fix the prices of milk, cream, and butter in violation of § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. According to plaintiff's complaint, the minimum milk price is set pursuant to a federally regulated formula, a component of which is the price of butter traded on the Chicago Mercantile Exchange ("CME"). Additionally, "by industry practice," the prices of cream and butter are based upon the CME butter prices. Plaintiff alleges that from November 2, 2000, to September 14, 2001 (the "class period"), defendants, which collectively control a dominant share of the United States butter market, conspired to inflate, and did inflate, the CME butter price in order to increase above competitive levels the wholesale prices of milk, cream, and butter that they charged their customers. As a result, plaintiff claims that it and the other class members were forced to pay artificially inflated prices and were damaged accordingly.

Defendants have moved to dismiss plaintiff's complaint pursuant to Rule 12(b)(6), Fed.R.Civ.P., based upon (1) plaintiff's lack of constitutional and antitrust standing; (2) the filed rate doctrine; (3) implied immunity; and (4) failure to state a claim upon which relief may be granted. For

---

1. The Court expresses no opinion on plaintiff's motion for class certification, which remains pending.

the reasons set forth below, the defendants' motion to dismiss [Doc. # 27] will be denied.

## STANDARD OF REVIEW

■ In ruling on a motion to dismiss under Rule 12(b)(6), Fed.R.Civ.P., the Court is required to accept as true all factual allegations in the complaint and to draw all reasonable inferences in favor of the plaintiff, as the non-moving party. *See Krimstock v. Kelly,* 306 F.3d 40, 47–48 (2d Cir.2002). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)(footnote omitted). A court must not consider whether the claim will ultimately be successful, but should merely "assess the legal feasibility of the complaint." *Cooper v. Parsky,* 140 F.3d 433, 440 (2d Cir.1998) (citation omitted).

■ A complaint need not set out the facts in detail. The Federal Rules require only a "short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8(a), Fed.R.Civ.P. "No heightened pleading requirements apply in antitrust cases." *Todd v. Exxon Corp.,* 275 F.3d 191, 198 (2d Cir.2001). "[A] short plain statement of a claim for relief which gives notice to the opposing party is all that is necessary in antitrust cases, as in other cases under the Federal Rules." *Id.* (quoting *George C. Frey Ready–Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.,* 554 F.2d 551, ·554 (2d Cir.1977)). Further, in antitrust cases, where "the proof is largely in the hands of the alleged conspirators," *Poller v. Columbia Broadcasting Sys., Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), the Supreme Court has held that "dismissals pri-

or to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hospital Bldg. Co. v. Trustees of Rex Hosp.,* 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976); *accord George Haug Co. v. Rolls Royce Motor Cars Inc.,* 148 F.3d 136, 139 (2d Cir.1998); *Subsolutions, Inc. v. Doctor's Associates, Inc.,* 62 F.Supp.2d 616, 619 (D.Conn.1999); *Strobl v. New York Mercantile Exch.,* 561 F.Supp. 379, 383 (S.D.N.Y.1983). In applying this "concededly rigorous standard," *Hospital Bldg. Co.,* 425 U.S. at 746, 96 S.Ct. 1848, our consideration is limited to the facts stated in the complaint, the documents attached thereto as exhibits or incorporated therein by reference, and matters of which the Court may take judicial notice under Rule 201, Fed.R.Evid. *See Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991).

## THE ALLEGATIONS

### I. The Parties

Plaintiff Ice Cream Liquidation, Inc., is a manufacturer of ice cream, which purchased milk and cream from defendants and other producers of milk and cream. (Comp.¶ 14.)

Defendant Land O'Lakes, Inc., is a cooperative of dairy farmers that produces 33.4% of the butter produced in the United States and markets milk, cream, and butter throughout the United States. (Comp. ¶ 15.) Defendant Dairy Farmers of America, Inc., is the world's largest cooperative of dairy farmers, and produces butter and more than 25% of the milk produced in the United States. (Comp.¶ 16.) Defendant Associated Milk Producers, Inc., processes and markets the milk and milk products of approximately 4,800 dairy producers, primarily producing and marketing butter. (Comp.¶ 17.) Defendants Grassland Dairy Products, Inc., and Keller's Creamery

LLC produce and market butter and cream. (Comp.¶¶ 18, 19.) Defendant Madison Dairy Produce Company produces and markets butter. (Comp.¶ 21.) Plaintiff alleges that the defendants that produce milk as well as butter produce approximately 35% of all milk produced in the contiguous United States. (Comp.¶ 7.)

## II. Conspiracy Allegations

As set forth in plaintiff's complaint, the price of milk in the United States has been regulated by the federal government for decades in order to assure dairy farmers a reasonable minimum price for their milk throughout the year, to prevent wild fluc-

tuations in milk prices during periods of heavy and light production, and to ensure consumers an adequate supply of milk. (Comp.¶ 30.) On January 1, 2000, the Federal Milk Marketing Orders ("FMMO") issued by the United States Department of Agriculture [2] went into effect, which, according to plaintiff, dramatically changed the regulations by which the price of milk is established.[3] (Comp.¶ 31.) Plaintiff alleges that since January 1, 2000, the minium price of milk has been fixed by a formula that incorporates and rises or falls with the CME butter or CME cheese price, whichever is higher.[4] Since the

2. The Agricultural Marketing Agreement Act of 1937, as amended, 7 U.S.C. § 601 *et seq.*, requires the Secretary of Agriculture to set minimum prices that handlers (those that process or distribute milk) must pay to producers (farmers) for their milk products. 7 U.S.C. § 608c(5); *see Kass v. Brannan*, 196 F.2d 791, 795–96 (2d Cir.), *cert. denied,* 344 U.S. 891, 73 S.Ct. 210, 97 L.Ed. 689 (1952). This is done through FMMOs, which are regulations issued by the Secretary of Agriculture that require milk handlers in a marketing area to pay to milk producers not less than certain minimum class prices established according to how milk is utilized. These prices are established under the FMMO after a public hearing at which evidence is received on the supply and demand conditions for milk in the market. An FMMO becomes effective only after approval by a certain percentage of dairy farmers. USDA Stat. Bull. No. 975, *Federal Milk Order Market Statistics—2000 Annual Summary* at 6 (Feb.2002) (Defs.' Mem. Ex. C). *See also* 7 C.F.R. Pt. 1000; *see generally United Dairymen of Arizona v. Veneman*, 279 F.3d 1160, 1162 (9th Cir.2002). Although an FMMO sets minimum prices for raw fluid milk, it does not set wholesale or retail prices for milk and dairy products. (Pl.'s Ex. E at 8.)

3. According to defendants, there were three FMMOs in effect during the class period—the January 1, 2000 FMMO, the January 1, 2001 amended FMMO, and the FMMO as changed by a January 31, 2001 preliminary injunction issued by the United States District Court for the District of Columbia in *Select Milk Pro-*

*ducers, Inc. v. Glickman,* No. 1:01CV00060(RCL) (Order Granting Prelim. Inj. Dtd. Jan. 31, 2001). (Defs.' Mem. at 7 & Ex. B.)

4. The complaint alleges that the ·FMMO formula incorporates the CME butter price or cheese price, whichever is higher. (Comp. ¶ 31.) As plaintiff's counsel conceded at oral argument, this is not exactly correct. Plaintiff's counsel stated that this was an accurate statement for part of the class period but not for the entire class period. He stated that "because butter was higher, the net result [ ] throughout the class period, [was that] the minimum was determined based on give or take 3.5 times butter fat price, which ... we contend and we allege was based on CME butter price." (Hr'g Tr. dtd. 9/4/02 at 37.) Counsel later agreed that, except in California, the CME price was not an express component of the FMMO after January 1, 2000. (Hr'g Tr. at 59.)

The regulation in effect prior to 2000 specifically referenced the CME butter price as a basis for establishing the minimum price of milk. *See* 7 C.F.R. § 1001.76 (1999). Those regulations were amended in 2000 to change the source of price data that would be used to generate milk prices to the National Agricultural Statistic Service ("NASS") · survey prices. 7 C.F.R. § 1000.50 (2000). (Pl.'s Mem. Ex. A); *see also* USDA Milk Marketing Order Statistics, Price Formulas for 2000 & 2001 (Pl.'s Mem. Ex. D.) Although there have been hearings on whether the source should be changed back to CME prices, the current

CME butter price has been higher nearly every month, the price of milk has been fixed in relation to the CME butter price since January 1, 2000. (*Id.*) Similarly, the wholesale prices of cream and butter, by industry practice, are determined by formulas that incorporate the CME butter price. (Comp.¶ 32.) During the class period, plaintiff claims that the CME butter price increased from $1.20 to $2.20, and as a result, the wholesale price of milk increased by $3.25 per hundred pounds, the wholesale price of cream increased by $1.50 per pound of butterfat, and the wholesale price of butter increased from $1.14 to $2.18, without any "rational economic explanation." [5] (Comp.¶¶ 41, 44(a).)

Plaintiff states that, unlike other commodities, cash or spot trading of butter on the CME is extremely limited. Butter trades only three days a week, and only two minutes per day, for a total trading period of six minutes per week. (Comp. ¶ 33.) Only a small percentage of the butter sold in the United States is actually traded on the CME. (*Id.*) Therefore, plaintiff alleges, it was possible for defendants, which controlled and manipulated the CME butter market, to increase the wholesale prices of milk, cream, and butter, simply by purchasing small quantities of butter on the CME for relatively little money. (Comp.¶¶ 35, 36.) In fact, plaintiff asserts that the CME butter price could increase even if no actual purchases took place, since approximately 40% of the time the CME butter price was based on unfilled bids and uncovered offers. (Comp. ¶ 36.) On the other hand, if defendants chose to purchase butter on the CME, their only risk was if the CME price declined and they chose to sell. (*Id.*) "Such unlikely and marginal losses would at most have added up to a few million dollars annualized, an insignificant risk of loss compared to the hundred of millions of dollars in increased annual revenues from the resulting increases in the price of milk." (*Id.*) "Consequently, a milk producer could, through a purchase of butter at an artificially high price, reap returns many times the cost of that butter through the sale of milk at artificially high prices." (Comp.¶ 37.)

Plaintiff alleges that defendants had the requisite motive and ability to drive up the CME butter price. Defendants collectively have a substantial share of the market in cream and a dominant share of the butter market in the United States and, thus, had a substantial economic motive to inflate artificially the CME butter price to increase the prices of milk and cream and to increase the price of butter in their inventories. (Comp.¶¶ 39, 40.) Plaintiff claims that this unlawful conspiracy is evidenced not only by the lack of a rational economic explanation for the increases that took place, but also by a statement by one defendant's representative to plaintiff's representative at a trade show that the

---

regulations retain the NASS survey prices as the source data. 7 C.F.R. § 1000.50 (2003); *see* Milk in the Northeast and Other Marketing Areas; Recommended Decision and Opportunity to File Written Exceptions on Proposed Amendments to Tentative Marketing Agreements and to Orders, 66 Fed.Reg. 54064, 54065, 54070–71 (Oct. 25, 2001). Thus, after January 1, 2000, the CME butter price was not an express component of the FMMO.

**5.** Plaintiff alleges that the January 1, 2000 FMMO created a substantial incentive for milk producers to increase the CME butter price. Plaintiff cites to a petition filed with the USDA by the Milk Industry Foundation and the Ice Cream Association, based on USDA data, which asserts that a 10% increase in the CME butter price over the course of a year would result in an increase of over $400 million in the aggregate FMMO minimum prices for all milk marketed in the United States in 2000. (Comp.¶ 34.)

price of butter was rising to levels that were not "moral" and that some "people" were "getting too greedy." (Comp.¶ 44.) Thus, as a result of defendants' unlawful conspiracy, plaintiff claims that it was deprived of the benefits of free, open, and unrestricted competition in the marketplace for the purchase of milk, cream, and/or butter (Comp.¶ 47) and was required to pay prices for milk, cream and butter substantially above the competitive level. (Comp.¶ 48.)

## DISCUSSION

### I. Standing

As a threshold matter, we consider defendants' argument that plaintiff lacks both constitutional standing and antitrust standing to bring this action. Defendants argue that, although plaintiff challenges their alleged price-fixing of the CME butter prices, plaintiff does not allege that it ever purchased butter on the CME and, therefore, it could not have been damaged by the alleged price-fixing conspiracy. Defendants concede that plaintiff has alleged that it purchased milk and cream, but these markets, it argues, are separate and distinct from the CME butter market. Defendants acknowledge that plaintiff has alleged a link between CME butter prices and the price of milk and cream, but they urge this Court to reject these bald assertions, particularly where, they maintain, the link between the markets is so attenuated and irrational. Thus, defendants argue that the alleged incidental effects on other markets of defendants' alleged price-fixing in the CME butter market are too remote to confer on plaintiff antitrust standing.

Plaintiff admits that it was not a purchaser in the CME butter market, but asserts that, as a purchaser of milk and cream, it was directly impacted by defendants' price-fixing because the CME but-

ter price is a component of the government-set formula, which regulates the minimum price for milk. As a purchaser of products impacted by defendants' price-fixing conspiracy, plaintiff claims to have standing to assert these antitrust claims on behalf of itself and others similarly situated.

### A. Article III Standing

■ Under Article III of the United States Constitution, a plaintiff seeking to invoke the jurisdiction of the court must establish that a case or controversy is presented. U.S. Const. art. III. In order to demonstrate standing under Article III "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). "At an irreducible constitutional minimum, Article III standing requires (1) that the plaintiff have suffered an injury in fact ...; (2) that there be a causal connection between the injury and the conduct complained of ...; and (3) that it be likely that the injury complained of would be redressed by a favorable decision." *St. Pierre v. Dyer,* 208 F.3d 394, 401 (2d Cir.2000) (internal quotation marks omitted). "The triad of injury in fact, causation, and redressability comprises the core of Article III's case-or-controversy requirement." *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 103–04, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).

■ Plaintiff's complaint alleges that defendants conspired to fix the prices of milk, cream, and butter by artificially inflating the CME butter price, and that plaintiff was damaged when it purchased milk and cream at these increased prices. (Comp.¶¶ 8, 10, 43, 46, 48.) Plaintiff has

sufficiently alleged an injury that is causally related to defendants' alleged price-fixing conspiracy. This is an injury that can be redressed by a favorable decision in this case. Accordingly, based on the allegations of plaintiff's complaint, we find that plaintiff has met the constitutional requirements for standing in order to pursue this claim.

### B. Antitrust Standing and Injury

Additionally, plaintiff must establish that it has antitrust standing to bring this action under the antitrust laws. Section 4 of the Clayton Act authorizes in the broad terms private suits to enforce the antitrust laws. It provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ... and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a).

Were we to consider only the literal language of the statute, there would be no question as to plaintiff's antitrust standing based upon its allegation that it was injured as a result of defendants' price-fixing activities, in violation of the Sherman Act. As the Supreme Court noted in *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 529, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), "[a] literal reading of the statute is broad enough to encompass every harm that can be attributed directly or indirectly to the consequences of an antitrust violation."

■ Nevertheless, based upon the legislative history of § 4, the courts have concluded that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation. *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 263, n. 14, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972).

An antitrust violation may be expected to cause ripples of harm to flow through the Nation's economy; but despite the broad wording of § 4 there is a point beyond which the wrongdoer should not be held liable.... It is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property.

*Associated General Contractors*, 459 U.S. at 534–35, 103 S.Ct. 897 (internal citations and quotation marks omitted). Thus, the Supreme Court has held that the issue of antitrust standing cannot be resolved simply by reference to the broad language of § 4. *Id.* at 535, 103 S.Ct. 897. Instead, we must "evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." *Id.*

■ The Second Circuit has stated that "[i]t is now well settled that in order to have standing to prosecute private antitrust claims, plaintiffs must show more than that the defendants' conduct caused them an injury." *Balaklaw v. Lovell*, 14 F.3d 793, 797 (2d Cir.1994). "Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Id.* (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)) (original emphasis).

■ Essentially, then, the antitrust standing inquiry requires us to first examine plaintiff's alleged harm, since this issue is potentially dispositive. If there is no

showing of injury, then plaintiff does not have a claim cognizable under the antitrust laws. *See Supermarket of Marlinton, Inc. v. Valley Rich Dairy*, 161 F.3d 3, 1998 WL 610648, at *2 (4th Cir.1998)(Table). Assuming plaintiff has sufficiently alleged an antitrust injury, we then must determine whether it has alleged sufficient facts to establish standing to maintain this private action under the antitrust laws. *See, e.g., Balaklaw*, 14 F.3d at 797, n. 9 (applying a two-pronged analysis); *Bristol Technology, Inc. v. Microsoft Corp.*, 42 F.Supp.2d 153, 163 (D.Conn.1998) (same).

### 1. Antitrust Injury

In order to demonstrate "antitrust injury," plaintiff must demonstrate an "injury of the type that the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990). This inquiry forces the Court to "connect the alleged injury to the purposes of the antitrust laws." *Bristol Technology, Inc.*, 42 F.Supp.2d at 165 (quoting 2 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 362, at 210 (rev. ed.1995)).

We assume for purposes of ruling on this motion to dismiss that a violation of § 1 of the Sherman Act, as alleged in the complaint, has occurred. Assuming such a violation, we find that plaintiff has suffered an antitrust injury. Plaintiff, as a consumer of products sold by defendants, alleges that defendants have used their domination of the butter market to fix the price of butter on the CME for the purpose of artificially inflating the wholesale prices of milk, cream, and but-

ter, which defendants sold to plaintiff and the class members. Thus, plaintiff claims to have been forced to pay prices not set by free market competition, but rather by defendants' price-fixing scheme. The injury alleged by plaintiff is the type of injury the Sherman Act, which seeks to preserve free and unfettered competition, was designed to prevent. *See Northern Pacific Railway v. United States*, 356 U.S. 1, 2, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). Moreover, it is the type of injury "that flows from that which makes defendants' acts unlawful"—*i.e.*, from the collusive price-fixing itself. "When horizontal price-fixing causes buyers to pay more ... than the price that would prevail in a market free of the unlawful trade restraint, antitrust injury occurs." *Knevelbaard Dairies v. Kraft Foods. Inc.*, 232 F.3d 979, 988 (9th Cir. 2000).

Defendants contend that a finding of antitrust injury requires that the injured party be a participant in the same market as the alleged malefactors. *See Knevelbaard Dairies*, 232 F.3d at 989. Defendants assert that they were participants in one market (the CME butter market) and that plaintiff was a participant in another (the wholesale milk, cream and butter markets). Defendants, however, overlook the fact that, although the alleged conspiracy to fix prices took place in the CME butter market, the purpose of this price-fixing was to artificially inflate prices in the milk, cream, and butter markets in which both plaintiff and defendants were participants—plaintiff and the class members as wholesale purchasers and defendants as sellers. *See Knevelbaard Dairies*,[6] 232 F.3d at 989. For purposes of this

---

**6.** In the *Knevelbaard Dairies* case, the plaintiffs were milk producers who claimed that the defendant cheese makers had conspired to depress the prices they paid for milk in Cali-

fornia by depressing the price of bulk cheese on the National Cheese Exchange ("NME"). Milk prices were allegedly lowered because the NME bulk cheese price determined the

motion to dismiss, these allegations must be accepted as true and are sufficient to establish an "antitrust injury."

### 2. Antitrust Standing

■ To determine whether a plaintiff has antitrust standing, the Supreme Court has identified five factors that should be considered:

(1) the causal connection between the antitrust violation and the harm to the plaintiff, and whether the harm was intended;

(2) the nature of the injury, including whether the plaintiff is a consumer or competitor in the relevant market;

(3) the directness of the injury, and whether the damages are too speculative;

(4) the potential for duplicative recovery, and whether the apportionment of damages would be too complex; and

(5) the existence of more direct victims.

*Bristol Technology,* 42 F.Supp.2d at 163 (citing *Associated Gen. Contractors,* 459 U.S. at 538–44, 103 S.Ct. 897).

With respect to the first factor, the causal connection between the harm and the unlawful activity and whether the harm was intended, as discussed above, plaintiff has alleged an antitrust injury caused by defendants' price-fixing. Plaintiff has further alleged that defendants acted with the knowledge that the prices of milk, cream, and butter would be impacted by this unlawful activity (Comp.¶ 8), and that, in fact, the prices were impacted substantially. (Comp.¶ 47.) We find that plaintiff has

sufficiently alleged a causal connection between the violation and harm and that the harm was intended by defendants.

As to the second element, the nature of the injury, plaintiff has alleged that it was a wholesale consumer required to pay the excessive, inflated prices charged by defendants. This is the type of injury protected by the antitrust laws.

As to the third element, the directness of the injury, defendants maintain that the correlation between CME butter prices and the wholesale prices of milk, cream, and butter paid by plaintiff and the class members is too speculative to provide plaintiff with standing to seek redress for this alleged injury. Defendants assert that the FMMOs in effect during the class period do not incorporate, or even refer to, the CME butter price. Rather, the FMMOs incorporate the wholesale price of butterfat, as determined by the National Agricultural Statistical Service ("NASS"),[7] as a key factor in setting the milk price. Thus, they argue that any impact on wholesale milk prices caused by their alleged price-fixing in the minuscule CME butter market is too remote to establish a causal link between the defendants' price-fixing and plaintiff's alleged injury.

■ As defendants correctly point out, there must be more than "a mere causal link" between the injury and the alleged antitrust violation; there must be a "direct effect." *See City of Pittsburgh v. West Penn Power Co.,* 147 F.3d 256, 268 (3d Cir.1998). To assess the directness of the injury, the courts have looked to the chain of causation between the alleged restraint

---

cost of fluid milk in California based on a regulated formula. 232 F.3d at 982. The Ninth Circuit held that the plaintiff-milk producers had alleged an antitrust injury and had standing to pursue these claims. *Id.* at 992.

7. The National Agricultural Statistics Service ("NASS") is part of the Department of Agriculture. Primary NASS responsibilities are the development and dissemination of national and state agricultural statistics, statistical research, and coordination of Department statistical programs. *See* 7 C.F.R. § 3600.1.

in the market and the injury. *See Knevelbaard Dairies*, 232 F.3d at 989.

The difficulty we have with defendants' argument is that it arises in the context of a motion to dismiss, where our consideration is limited ·to the allegations of the complaint, which we accept as true and from which we draw all reasonable inferences in plaintiff's favor. Defendants concede that plaintiff has alleged a causal link between the CME butter price and the wholesale price of milk, cream, and butter. However, defendants implore the Court to look beyond this and, based upon the regulations in effect during the class period, hold that the relationship between the two is too attenuated to support a causal link.

Although the regulations do not specifically incorporate the CME butter price, *see* Note 4, *supra,* plaintiff has alleged and may be able to prove a sufficiently direct causal link. We note, for example, that the Department of Agriculture, in reviewing comments it received in response to its notice of proposed rulemaking concerning a new FMMO, described the CME as a "mechanism for establishing prices on which the dairy industry relies. Thus, a lot of contracts to buy and sell dairy products are based on CME prices.... According to several witnesses, cheese and butter processors generally base their contract sales on CME prices." Milk in the Northeast and Other Marketing Areas; Recommended Decision and Opportunity To File Written Exceptions on Proposed Amendments to Tentative Marketing Agreements and to Orders, 66 Fed.Reg. 54064, 54070 (USDA Oct. 25, 2001). Moreover, although plaintiff does allege that the price of milk is federally regulated, plaintiff has alleged that the price of cream and butter is set by industry practice which incorporated the CME butter price.

We make no findings at this point on the causal connection between the CME butter price and the wholesale prices of milk, cream, and butter. Plaintiff has alleged such a connection, which is not so attenuated or speculative that we can reject it outright so as to deny plaintiff standing to pursue this antitrust claim. However, this is a matter that may be revisited after discovery.

As for the fourth element, the risk of a duplicative recovery, there appears to be no risk of this nature and defendants have not suggested otherwise. Likewise, it does not appear that the apportionment of damages would be so complex as to warrant denying standing to plaintiff and the putative class.

Finally, as to the last element concerning the existence of more direct victims, presumably the most direct victims of defendants' alleged price-fixing scheme would be purchasers of butter on the CME who paid the inflated prices. However, the antitrust laws do not limit standing to only that class of purchasers with the most direct injury. We find that plaintiff has alleged a sufficiently direct injury to allow plaintiff to have standing to pursue this claim.

In summary, we hold that plaintiff has sufficiently alleged both antitrust standing and antitrust injury to withstand defendants' motion to dismiss on that basis.

## II. *Filed Rate Doctrine*

 Under the "filed rate doctrine," the filing of rates with any appropriate regulatory body generally prevents the assertion of antitrust liability arising from· the charging of the filed rate. 54 Am.Jur.2d, *Monopolies and Restraints of Trade* § 299 (2002). "Stated simply, [the filed rate] doctrine holds that any 'filed rate'—that is, one approved by the governing regulatory agency—is per se reasonable and unassailable in judicial proceed-

ings brought by ratepayers." *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir.1994); *see also Keogh v. Chicago & Northwestern Ry. Co.*, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922) (rejecting a challenge to rates charged by common carriers that had been approved by the Interstate Commerce Commission); *County of Stanislaus v. Pacific Gas & Elec. Co.*, 114 F.3d 858, 862 (9th Cir.1997) (holding that filed rate doctrine barred federal antitrust price-fixing claims of customers of natural gas distribution company against company and others, alleging that rates approved by FERC were product of antitrust violations), *cert. denied*, 522 U.S. 1076, 118 S.Ct. 854, 139 L.Ed.2d 754 (1998). The filed rate doctrine reflects the dual concerns that rates set by a regulatory agency should be stringently applied to prevent unjust discrimination and that the courts should avoid impermissible judicial ratemaking. *Montana–Dakota Utilities Co. v. Northwestern Pub. Serv. Co.*, 341 U.S. 246, 251–52, 71 S.Ct. 692, 95 L.Ed. 912 (1951); *Keogh*, 260 U.S. at 163, 43 S.Ct. 47; *see also Marcus v. AT&T Corp.*, 138 F.3d 46, 58–59 (2d Cir.1998) (describing the two purposes of the filed rate doctrine as the "nondiscrimination strand" and the "nonjusticiability strand"). Application of the filed rate doctrine in any particular case is not determined by the culpability of the defendant's conduct or the possibility of inequitable results. *Marcus*, 138 F.3d at 58. Nor does the doctrine's application depend on the nature of the cause of action the plaintiff seeks to bring. *Id.* Rather, the courts have held that the doctrine is to be applied strictly to prevent a plaintiff from bringing a cause of action whenever either purpose underlying the filed rate doctrine is implicated. *Id.*

■ Defendants assert that plaintiff's antitrust claims against them relating to federally regulated milk prices are barred by the filed rate doctrine because the only thing that plaintiff challenges is the minimum raw milk price set by the USDA's FMMO, which plaintiff contends was fixed by defendants' manipulation of the CME butter market. According to defendants, plaintiff does not claim that anything above this minimum price was affected by the CME or defendants' alleged price-fixing. Thus, defendants assert that since plaintiff is challenging rates set by the USDA, its claim is barred by the filed rate doctrine.

Plaintiff responds that it is not challenging the minimum milk pricing formulas established by the USDA or any act of the USDA, but rather defendants' later conduct in manipulating the underlying components of the formulas. (Hr'g Tr. at 48.) Additionally, plaintiff argues that the USDA-approved FMMOs set only minimum prices, not fixed, uniform rates that apply to all. Instead, Congress left the determination of milk prices above this floor to market forces. Further, plaintiff asserts the filed rate doctrine does not apply because plaintiff cannot seek redress from any regulatory agency for the wrongs asserted in its complaint.

As noted above, plaintiff's complaint encompasses not only wholesale milk prices, but also cream and butter prices, which are allegedly set by "industry practice" and, thus, would not be encompassed by the "filed rate doctrine."

With respect to plaintiff's challenges to the wholesale prices for milk charged by defendants and others, as we read plaintiff's complaint (and with further clarification from plaintiff's counsel at oral argument), contrary to defendants' assertions, plaintiff is not challenging the FMMOs set by the USDA, nor is plaintiff challenging the minimum milk rates set thereunder. As plaintiff seems to concede, any claim challenging these orders or the rates

themselves clearly would be barred by the filed rate doctrine. (Hr'g Tr. at 49.); *see Servais v. Kraft Foods. Inc.*, 631 N.W.2d 629, 631 (Wis.App.2001), *aff'd*, 252 Wis.2d 145, 643 N.W.2d 92 (2002) (equally divided court). Rather, plaintiff is challenging defendants' inflated wholesale milk prices in excess of the minimum milk prices, which wholesale prices were never approved by the USDA. Plaintiff claims that these were inflated as a result of defendants' manipulation of CME butter prices, which in turn allegedly affected wholesale butter prices and, thus, NASS survey prices. The NASS survey prices were then used in setting the *minimum* milk rates pursuant to the USDA-approved FMMO, which set a floor for prices that producers could charge handlers. Plaintiff, however, is not challenging these USDA-set minimum prices or the formula used to calculate these prices, but rather the wholesale milk prices charged by defendants. Thus, since the prices charged by defendants were never approved by the USDA, the filed rate doctrine would not apply.

We have found no case that has applied the filed rate doctrine in a context such as this. The case most analogous to the instant case is *Servais*, 631 N.W.2d at 632–34, in which the Wisconsin Court of Appeals applied the filed rate doctrine to bar an antitrust action for compensatory damages by dairy farmers of raw milk against cheese manufacturers, in which the farmers claimed that the manufacturers had manipulated the prices paid on the National Cheese Exchange and elsewhere in order to lower the milk orders' minimum pay prices. The Court held that, because the milk orders at issue were federally established rates, the filed rate doctrine precluded the court's substituting its judgment for that of the USDA as to what constituted a reasonable minimum milk price. *Servais*, 631 N.W.2d at 634.

Here, unlike the plaintiffs in *Servais*, plaintiff is not challenging allegedly deflated minimum raw milk prices. Instead, plaintiff is challenging artificially inflated prices charged by defendants above these minimums. These prices were neither regulated nor approved by the USDA. As the Court noted in *Servais*, the Agricultural Marketing Agreement Act establishes only minimum pay prices for milk. It does not forbid the payment of prices above the minimum set by a milk order. 631 N.W.2d at 631. Thus, as we interpret plaintiff's complaint, plaintiff is not asking the Court to engage in judicial rate-making by substituting its judgment for that of the USDA, nor to create discriminatory rates that would apply to some handlers and not others. Neither of the underlying purposes of the filed rate doctrine are implicated. Accordingly, defendants' motion to dismiss based upon the filed rate doctrine is denied.

### III. Implied Immunity

Implied immunity from a Sherman Act violation is found in two situations: "first, when an agency, acting pursuant to a specific Congressional directive, actively regulates the particular conduct challenged, . . . and second, when the regulatory scheme is so pervasive that Congress must be assumed to have forsworn the paradigm of competition." *Northeastern Telephone Co. v. AT&T*, 651 F.2d 76, 82 (2d Cir.1981) (citing *Gordon v. New York Stock Exch., Inc.*, 422 U.S. 659, 685–86, 688–89, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975)), *cert. denied*, 455 U.S. 943 (1982).

Defendants maintain that the USDA has exclusive jurisdiction over the pricing of milk and that extensive rule-making procedures precede the issuance of a FMMO. "The USDA's setting of defendants' prices for milk is antithetical to plaintiff's attempted application of the antitrust laws.

Thus, defendants' charging of the FMMO milk price is entitled to antitrust immunity." (Defs.' Mem. at 21.)

Plaintiff argues that whenever claims of implied immunity are raised, they must be evaluated in terms of the particular regulatory provision involved, its legislative history and the administrative authority exercised pursuant to that provision, citing *In re Midwest Milk Monopolization Litigation*, 380 F.Supp. 880, 887 (W.D.Mo.1974). They assert that it is well-settled that antitrust violations relating to FMMOs entered pursuant to § 608c(9) of the Agricultural Marketing Agreement Act, 7 U.S.C. § 608c(9), are not immunized from challenges under the Sherman Act. *Id.* (Pl.'s Mem. at 20.) Defendants respond that under *Borden*, the FMMOs approved and directed by the USDA are immune from antitrust liability.

Section 608b(a) of the Agricultural Marketing Agreement Act provides in relevant part:

> In order to effectuate the declared policy of this chapter, the Secretary of Agriculture shall have the power ... to enter into marketing agreements with processors, producers, associations · of producers, and others engaged in the handling of any agricultural commodity or product thereof .... The making of any such agreement shall not be held to be in violation of any of the antitrust laws of the United States....

Defendants maintain that this exemption from antitrust liability covers FMMOs. Plaintiff responds that FMMOs are not agreements, but orders, and do not fall within this provision, citing *United States v. Borden Co.*, 308 U.S. ·188, 200, 60 S.Ct. 182, 84 L.Ed. 181 (1939).

As the Court in *Midwest Milk Monopolization Litigation* explained:

> In the Agricultural Adjustment Act (specifically, 7 U.S.C. § 608b), there is

provided a limited form of antitrust immunity. Section 608b immunizes agricultural marketing agreements ·from the operation of antitrust laws, but this provision has no application to the present controversy. The Secretary of Agriculture is authorized to enter into marketing agreements with producers and processors, and such agreements will not be invalidated because they may have anti-competitive effects.... But it has long been recognized that the marketing of agricultural products is not per se immune from the Sherman Act.... The court [in *Marketing Assistance Plan, Inc. v. Associated Milk Producers, Inc.*, 380 F.Supp. 880 (W.D.Mo.1974)] explicitly held that the § 608b exemption was limited to the "making of marketing agreements," and was irrelevant to alleged antitrust violations relating to federal marketing orders under § 608c. We agree with this conclusion.... Moreover, it is the marketing agreements, and not all conduct in relation to such agreements, which is exempt from the operation of antitrust laws.

390 F.Supp. at 699–700, *but see Berning v. Gooding*, 643 F.Supp. 26, 29 (D.Or.1985), *aff'd on other grounds*, 820 F.2d 1550 (9th Cir.1987) (holding that there was no substantial difference between the making of a marketing agreement and the issuance of a hop order and, thus, granting defendants immunity for acts committed within their statutory authority).

More importantly, however, as discussed above, plaintiff is not challenging the FMMOs approved by the USDA, nor is plaintiff challenging the minimum prices set by the FMMOs. Therefore, we hold that the implied immunity doctrine does not apply to plaintiff's claims.

## IV. Adequacy of the Conspiracy Allegations

Lastly, defendants urge this Court to dismiss plaintiff's complaint for failure to

plead conspiracy with specificity. Citing *Estate Construction Co. v. Miller & Smith Holding Co.*, 14 F.3d 213, 221 (4th Cir. 1994), defendants argue that plaintiff must provide some details of the time, place, and alleged effect of the conspiracy, and that plaintiff's bare bones statement of conspiracy warrants dismissal. Plaintiff responds that it has fulfilled the notice requirements of the Federal Rules by directly alleging an antitrust conspiracy and by alleging facts from which a fair inference of an antitrust conspiracy may be drawn. Plaintiff states that it provided the time period during which the conspiracy operated, it identified the participants, and described the effects of the conspiracy, which are adequate to meet the notice pleading requirements. *See George C. Frey Ready–Mixed Concrete, Inc.*, 554 F.2d at 554.

As we noted above in discussing our standard of review, a motion to dismiss for insufficiency should rarely be granted, especially where the proof of the conspiracy lies in the hands of the conspirators. *See Mirage Resorts, Inc. v. Trump*, 1998 WL 898340, at *4 (S.D.N.Y. Dec.22, 1998). Plaintiff has provided defendants with sufficient notice of the basis for its claim against them that they can adequately provide a defense. Plaintiff should be allowed a reasonable opportunity to develop the facts through discovery. The *Estate Construction* case cited by defendants is distinguishable. In that case, the plaintiff had alleged no facts at all regarding the elements of the conspiracy and "merely reiterated mechanically the words of the Sherman Act...." 14 F.3d at 221–22. Plaintiffs in this circuit have not been required to specify individual acts of each defendant in an antitrust conspiracy allegation. In *Alco Standard Corp. v. Schmid Brothers, Inc.*, 647 F.Supp. 4 (S.D.N.Y. 1986), the court held that "[i]t is not necessary to plead either the evidence or the facts upon which antitrust conspiracy are

based.... Plaintiff has identified the co-conspirators and described the nature and effect of the alleged conspiracy. This is sufficient....". *See In re Nasdaq Market–Makers Antitrust Litigation*, 894 F.Supp. 703, 712 (S.D.N.Y.1995); *see generally In re Milk Indirect Purchaser Antitrust Litigation*, 588 N.W.2d 772 (Minn.Ct. App.1999) (construing the pleading requirements for state antitrust action in accordance with federal law).

Viewing plaintiff's complaint as a whole, we find that there are sufficient allegations to withstand a motion to dismiss and to provide defendants with notice of plaintiff's antitrust allegations against them. Therefore, defendants' motion to dismiss based upon the insufficiency of the allegations of a conspiracy will be denied.

### CONCLUSION

Accordingly, defendants' motion to dismiss [Doc. # 27] is DENIED in all respects. The stay on discovery ordered by the Court at the September 4, 2002, hearing is hereby LIFTED. This case will be referred to Magistrate Judge William I. Garfinkel to supervise all aspects of discovery. Defendants shall have 21 days to file opposition to plaintiff's motion for class certification, after which plaintiff will have 10 days to reply. *See* D. Conn. L. Civ. R. 9(a).

**SO ORDERED.**